Chief Justice Robertson
delivered the Opinion of the Court—.
Judge Ewing took no part in the decision.
Nancy, a colored woman born in the state of Maryland about the year 1795, and claiming to be free in consequence of the last will of Rebecca Ring, proved and established in that state, in the year 1801, brought an action of trespass against Robert Boyce, who had held her as a slave more than twenty years, and, after a protracted trial, obtained a verdict and judgment, from which he has appealed to this Court.
Where a right accrued by virtue of an act donein pursuance of a statute of another state, and a ■suit is brought here to enforce the right, the law of that state, as expounded by her courts, will be regarded as the law of the case.
*237 The only question which requires special consideration, and to which the counsel of the appellant directed his chief arguments, is, whether the facts which appeared on the trial, and the law applicable to them, authorized the verdict of the jury.
The will declared that Nancy, then about six years old, should be free when she should attain twenty-one years of age; and it clearly appears that she was, at the date of the will, the property of the testatrix, who, by the law of Maryland, then in full force, had the right to emancipate her. She was, of course, more than twenty-one years old when this suit was instituted, and has also been identified by indisputable testimony.
But the statute of 179G, which was, at the date of the will, the only law of Maryland recognizing the right of testamentary emancipation, contains the following proviso:—“that no manumission hereafter to be made by “ last will and testament shall be effectual to give free- “ dom to any slave or slaves, if the same shall be in “ prejudice of creditors, nor unless the said slave or “ slaves shall be under the age of forty-five years, and “ able to work and gain a sufficient maintenance and “ livelihood at the time the freedom given, shall com- “ menee.” And the appellant’s counsel insists, that the established facts prove, that Nancy was sold by the executor of Mrs. Ring, for the payment of her just debts; and that, on that ground alone, the verdict was contrary to the law and the facts of the case: because, as he contends: (1.) according to the judicial interpretation of the foregoing proviso, in the state of Maryland, the executor had a legal right to hold Nancy, and to sell her as assets for the benefit of creditors. (2.) A sale of her by him, whether necessary or not for the payment of any debt, vested an indefeasible title in the purchaser. And, (3.) that she was sold by the executor, and that the sale was, in fact, necessary for the payment of a debt of the testatrix.
Conceding that the law of Maryland, as authoritatively expounded there, should be regarded by this Court as the law of this case, we shall not pause to decide or to enquire whether it be such as has been suggested by the *238 counsel. For, whatever it may be admitted to be, we cannot decide that the jury had no authority for finding that the appellee is free.
The personal representative may sell the slaves of the decedent, if necessary, for the payment of debts; and if he assume that the necessity exists, though there are other assets enough, the purchaser’s title (in Va. & Ky.) will be protected, against heirs and devisees. But the policy on which this rule (in favor of purchasers) is founded, yields to other considerations, where a slave emancipat'ed by will, is thus sold. Such negro cannot bo deprived of his freedom, unless the contingency (injury to creditors) upon which the emancipation is prohibited, has actually occurred; and a sale by the executor, or a sale under an execution against the estate, when there are assets to pay the debt, and uo actual necessity for the sale, will not deprive the negro of freedom.
In a suit for freedom, by a negro emancipated in Maryland, by the last will of the owner, the def’t relies on a statute of that state prohibiting emancipation “to the prejudice of creditors,” and a purchase of the negro under an ex’on against the ex’or. From the proof, the jury might infer (X) that there was no bona fide debt, as the ex’or knew; or (2) that there were other assets enough to pay all thedebts; or (3) that the debt for which the sale was made, had been satisfied, and the sale collusive & fraudulent;or(4) that there was no sale, or not sufficient proof of one; or [5] that there was a fraudulent combination to defeat the intent of emancipation; or [6] that the ex’or had assented to the legacy of freedom to the negro;or[7]that the negro was not sold as a slave, but only for a term that had expired: and the verdict ofthe jury finding the negro free, where any of those facts could be inferred,should not be disturbed.
*238 We should be unwilling to admit that, if the executor had power to sell, an unnecessary sale by him would divest the appellee of her right to freedom. We cannot believe that the benevolent purpose of the testatrix depended for its effectuation, altogether on his caprice or his integrity; and it seems to us, that the reason of policy which induced the courts of Virginia and Kentucky to decide, that a sale of a slave by a personal representative, even though not necessary for paying any debt, would vest the title in the purchaser, does not apply to an unauthorized or unnecessary sale of a person entitled to be free. It cannot be very material to a distributee whether he have distribution of a slave in kind, or of the value in money; nor w’hether he may follow the slave into the hands of a purchaser, or shall look to the executor or administrator for the price. And therefore, as strangers cannot be. presumed to know when a sale of a slave may be necessary for paying debts, and as it is important that a purchaser should have an assurance of title not depending on the mere will or judgment of the vendor—therefore, it has been correctly decided that, in such a case, it is better that a bona fide purchaser should hold the slave, and that the distributee should take the value. But, when a person entitled to freedom is unnecessarily sold as a slave, a different case is presented; and the nature of the right affected should overrule the policy of assuring confidence and security to purchasers. The person sold has no equivalent or alternative; and the right, which he loses, is above all price. And therefore, if the power to sell, whenever a sale shall be necessary for paying a just debt, be conceded, we should be of the opinion that, unless there was such necessity for selling the appellee, the only contingency on which she could have been legally deprived of her freedom having never occurred, she cannot, according to law, be a slave.
The alleged sale of the appellee is unsupported by any other testimony than that of the executor himself; and *239 was not, according to his own exhibits, at all necessary for the payment of any debt.
The executor says that, in 1808, the appellee was sold under an execution on a judgment which the executor of one Troth, his brother-in-law, had obtained against him, in June, 1807, on a bond which he had given to him in May, 1804, on account of a claim he had set up against Mrs. Ring, after her death, for an alleged balance of nearly three thousand dollars, of Mrs. Troth’s interest in her father’s estate, who had died in 1785; and of whose will, his widow, afterwards Mrs. Ring, was executrix. And he shows, by his testimony, that it was almost certain that Troth had no pretence of right, and that he himself had no doubt, when he gave his obligation to him, that Mrs. Ring had, long before, paid him all that he was entitled to. But, if Troth had any just or available claim against the executor, a sale of the appellant was evidently not necessary for paying any portion of that demand. Assets to the amount of $2,107 96 4 were admitted by the executor, in his official settlement; and in that amount none of the persons who had been emancipatedjWere included as slaves, but only the value of their services until the periods prescribed for their liberation, was charged. In a settlement, made on the 9th of February, 1802, the executor obtained a credit for £319 6, alleged to have been paid to Troth. In another and last settlement, he obtained another credit for £496, for another payment claimed to have been made to Troth, in discharge of Ids entire demand; and thus a balance of £172, was reported in his favor as executor. But those settlements, and that with Troth, in May, 1802, exhibit intrinsic proofs that the true balance was against him.. Several other persons, as well as the appellee, were prospectively emancipated by Mrs. Ring’s will; and the executor had sold the time of service of two of them for two hundred dollars more than the appraised value, and was not charged in either of his settlements, with any portion of that sum, nor with any sum for the services of any of the other slaves.
If these omitted items be charged, and £79, allowed to the executor for his commission, be deducted, there *240 can be but little doubt that there was a small residuum of assets in his hands after giving him a credit for the whole amount which, as he says, he had paid to Troth.
An ex’or who gives his own bond for a debt of the testator, and thus extinguishes the debt, cannot after-wards sell a negro emancipated by the will, to pay it, under the pretence of saving the rights of creditors from the effect of the emancipation.
Then, Troth’s entire demand, just or unjust, having been paid out of the assets, and the executor having, in his official settlement, accounted for the assets by an alleged and allowed appropriation of them to the ex-tinguishment of that demand, there was no pretence for selling the appellee for paying that debt.
And, in fact, as well as in law, the bond given to Troth, after all of those settlements, was' the personal debt of the principal obligor, and he had no semblance of authority to sell the appellee as a slave, to pay his own individual debt.
But it, also, may be inferred from the proof, that sometime in the year 1805, the appellant sold the appellee, as a person entitled to be free at twenty-one years of age, and bought her himself; and that, about the time of the pretended sale of her under execution, she was forced from Maryland, under the cover of night, and brought to Kentucky.
Besides no execution has been exhibited; nor any bill of sale from the executor. But the record contains a bill of sale from one James B. Roper to one William Corner, dated December 13th, 1808, and an assignment of the same date, from Corner to one John Baird.
Now, from the foregoing facts, a jury might reasonably have made any or all of the following deductions:—
First—that Mrs. Ring owed Troth nothing, and that her executor could have been compelled to pay nothing, and knew that fact.
Second—that, even after allowing, as was done, a credit for the whole amount of Troth’s fabricated claim, there was a small balance of assets in the executor’s hands.
Third—that Troth’s demand having been satisfied by an appropriation of assets, long before the alleged sale of the appellee, under an execution against the executor, for a portion of Troth’s judgment against him, and which he had confessed, the sale was illegal and fraudulent.
In Maryland, snch slaves only as Can gain a living by labor, may be emancipated: held, that a jury may infer, that one suing for free dom given there, wasfit[tobeeman eipated,/rom the fact, that she is held in slavery, and her right to freedom resisted.
Fourth—that there was, in fact, no such sale as 'that alleged, or, at least-, that there is not sufficient proof of it.
Fifth—that ‘there was a fraudulent combination between Troth and the executor, and also between the executor and the person or persons who got the appellee from him-.
Sixth—that the executor had, prior to 1808, assented to the legacy of freedom to the appellee-.
Or, seventh—that, if the executor was not guilty of •any fraud, he sold the appellee, noí as á slave, and therefore no bill of sale from him has been shown or accounted for.
And, if the jury could have inferred that there had -been fraud in the sale, or that there had been no sale of the appellee as a slave, or that the’fexeeutor had assented to the legacy to hen, it is not material whether of not a bona fide sale, not necessary for paying any debt -of the testatrix, would have vested a good title.
Upon such facts, authorizing such deductions, this Court camrot decide that the verdict was rendered without any evidence to support it, or was contrary to the evidence or the law. And therefore, even if we could concede that the evidence, tested by the' law, preponderated against the verdict, we should not feel authorized to set aside the concurrent action of the jury and the judge, who, upon a full and dispassionate consideration of all the facts, have decided that the appellee is-, and of right ought to be, a free woman.
It is argued, however, that there being no proof thát the appellee was, when she attained twenty-ohe years of age, able to maintain herself, the jury had no right to decide that she was free, according to the law of Maryland. To this only one answer will be given, and that is, that, although the fact has not been expressly proved, yet we suppose that the jury had a right to infer it from the conduct of the appellant in holding her sn slavery, and in resisting her efforts to be liberated, and permitted to maintain herself by her own labor.
Wherefore, it is considered that the judgment of the Circuit Court be affirmed.